UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| PAMELA A. LEEMAN, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| v. | ) | Cause No. 3:14-CV-1777 RLM |
| | ) | |
| REGIONS INSURANCE, INC., | ) | |
| | ) | |
| *Defendant* | ) | |

OPINION AND ORDER

This ruling disposes of a summary judgment motion that has awaited ruling for an inexcusably long time. It is unusually difficult to get one's arms around the facts in this case, but no explanation or justification for so long a delay approaches reasonableness. The court can only offer the parties a sincere and embarrassed apology.

Pamela Leeman sues her former employer, Regions Insurance, on a variety of theories for conduct connected with her employment by Regions as an insurance agent, or "producer". She was paid through commissions. Ms. Leeman is a female, was born in 1949, and ws more than 40 years old throughout her employment with Regions from 1996 to March 31, 2015. She sues Regions for sex and age discrimination, for discriminatory retaliation, and for violation of the Equal Pay Act, and for breach of contract. The court granted Regions' summary judgment on the contract claims (Counts 1 and 2) [Doc. No. 85], and, for the following reasons, grants its motion for summary judgment on all remaining

claims (Counts 3-8)  [Doc. No. 58].

## I. STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Protective Life Ins. Co. v. Hansen, 632 F.3d 388, 391-392 (7th Cir. 2011). The court must construe the evidence and all inferences that reasonably can be drawn from the evidence in the light most favorable to Ms. Leeman, the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  But inferences cannot be based only on "speculation or conjecture," Herzog v. Graphic Packaging Int'l Inc., 742 F.3d 802, 806 (7th Cir 2014); Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc., 517 F.3d 470, 473 (7th Cir. 2008), and "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986) (emphasis in original); *see also* Dawson v. Brown, 803 F.3d 829, 833 (7th Cir. 2015).  "[T]he requirement is that there be no genuine issue of material fact." *Id.*  "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." Egonmwan v. Cook County Sheriff's Dept., 602 F.3d 845, 849 (7th Cir. 2010) (quotation marks omitted).

II. BACKGROUND

The following facts are taken from the summary judgment record and are viewed as favorably to Ms. Leeman as is reasonable.

Ms. Leeman worked as an insurance agent for Regions and its predecessor, Miles & Finch, from 1996 until April 1, 2015, when she was terminated.

From 2006 to April 2015, Ms. Leeman was compensated under an agreement that was executed while she still worked for Regions predecessor, Miles & Finch; but she remained an employee at will. Under the terms of Ms. Leeman's employment agreement, she received a portion of Miles & Finch's commission when a client purchased insurance from her – generally 35% on business she handled alone. Ms. Leeman also co-managed accounts with Brett Cain. She and Mr. Cain worked out a side agreement with Miles & Finch for those shared accounts under which they received a 50% commission and split the commission evenly.

In early 2007, Regions purchased some of Miles & Finch's assets. Regions continued to employ several of Miles & Finch's agents, including Ms. Leeman (born 1949), Brett Cain (born 1961), Pierre Fox (born 1969), Douglas Heath (born 1955), James Iovino (born 1969), Richard Lemming (born 1947), William Martin (born 1970), Joseph Sandifer (born 1971), William Thatcher (born 1957), and Christopher Williamson (born 1968). The agents' job responsibilities and

compensation structure were unchanged, and Ms. Leeman and Mr. Cain were allowed to continue their shared account arrangement.

Regions President Mike Miles, who also worked as a producer, handled the reassignments of customers and accounts for Regions from 1996 until his June 2012 retirement. Ms. Leeman believes Regions' reassignments from one producer to another were unfair and discriminatory.[1] Regions says it reassigned accounts from a departing producer to a successor producer based on a variety of factors, such as whether a producer had a connection to the account or the first producer, whether a producer had particular experience with the account's industry, and whether a producer had contacts geographically near the account.

Mr. Miles reassigned most of his accounts to his daughter, Jenny Fisher, when he retired. Ms. Leeman understood until 2013 that all of Mr. Miles's accounts had been reassigned to Ms. Fisher. When Mr. Miles was thinking about retirement in early 2012, he told Brett Cain (who shared accounts with Ms. Leeman) that he wanted Mr. Cain to take over Mr. Miles's Dilling Group Account in Logansport. Ms. Leeman handled nearly all the other accounts in Logansport. Mr. Miles told Mr. Cain not to mention the plan to anyone. Ms. Leeman didn't learn of the reassignment of the Dilling account and a related account to Mr. Cain

---

[1] Regions unhelpfully describe this argument as "her next effort to distract the Court . . ." [Doc. No. 80 at 8]. The court is better served with discussions of the facts and applicable law than with forays into an adversary's intent. The court also encourages counsel not to accuse an adversary of questionable ethics with nothing more than counsel's belief that things look that way.

until 2013, the year after Mr. Miles retired and after the accounts had generated $200,000 in revenue for Mr. Cain. Based on his observations, Mr. Cain opined that Mr. Miles avoided women and found Ms. Leeman intimidating.

Four of Mr. Miles's accounts related to the Kokomo schools were assigned to Phil Thatcher. Before that, Ms. Leeman had worked with Mr. Miles in servicing those accounts, and, she says, had a relationship with school officials. Mr. Thatcher hadn't been involved with these accounts or any other school accounts before receiving the Kokomo schools accounts.

Ms. Leeman was never reassigned a retiring producer's account until just before her resignation. She had a few accounts reassigned from Mr. Miles in 2004, when he was still employed, but those accounts were reassigned to Mr. Miles's daughter, Jenny, in 2012.

Regions began to make changes to the terms of compensation in 2012, when it reduced the rate of compensation on new co-managed/shared accounts from 25% to 17.5%.

In 2013, Regions adopted what it called its "Verticals Program" to encourage partnering and sharing of information and resources between producers with familiarity in a specific industry. Producers with such familiarity were designated through the Verticals Program. A producer's participation in the program was entirely voluntary. Ms. Leeman asked to participate, but never got into the program. She says Regions Chief Operating Officer J.R. Martin told her in late

autumn 2013 that a producer had to be nominated to gain access to the program. He asked her about her accounts in the medical field and told her she would be nominated because of her experience with medical accounts. As Ms. Leeman remembers it, Mr. Martin called her later to tell her that Regions President James Iovino had rejected her nomination in favor of Chris Williamson. Mr. Iovino testified that he didn't recall discussing Ms. Leeman and the Verticals Program with Mr. Martin. He said Ms. Leeman wasn't made a part of the program because she never volunteered. Ms. Leeman said at her deposition that she never told Mr. Iovino or any other "member of management" that she wanted to participate." Mr. Iovino also testified that as things turned out, participation in the Verticals Program didn't generate much extra business for the volunteers.

At this stage, the court must credit Ms. Leeman's telling of the events, so the court accepts that Ms. Leeman told the COO she wanted to participate and either the COO kept her wish to himself and told her than the President rejected her participation, or the President rejected her participation and didn't remember things accurately at his deposition. In either event, the court accepts that Ms. Leeman asked to participate, wasn't admitted into the Verticals Program, and was lied to by someone in Regions management. Chris Williamson, a younger man, was allowed into the Verticals Program.

Regions introduced its "Producer Validation Program" around July 2013. Each producer had to generate at least $350,000 to be a validating producer. Mr.

Martin spoke with Ms. Leeman by phone a few times in 2013 about what she had to do under the program. In early 2014, Regions announced that it would terminate any producer not on track to be a validating producer that year. Regions identified five producers (including Ms. Leeman) as non-validated.

The President and CEO of Regions Indiana, James Iovino, met with Ms. Leeman on March 11, 2014. He told Ms. Leeman she was below the threshold validation level. Ms. Leeman didn't know she was on the non-validated list until Mr. Iovino told her in March 2014. By Regions's calculations, Ms. Leeman was about $100,000 below the validation threshold. Ms. Leeman disputed the numbers Mr. Iovino relied on, but agreed she was below the $350,000 threshold.

Mr. Iovino told Ms. Leeman that she would be let go if she didn't meet the threshold validation level, and offered her the option of retiring. Mr. Iovino told her that in light of the numbers, she would be terminated in July, or "your other option is you can go ahead and retire," in which event Mr. Iovino would try to get Regions to allow her to stay until the end of the year. Mr. Iovino didn't mention the possibility of a performance improvement plan, and Ms. Leeman didn't ask.

Ms. Leeman said she would retire rather than be terminated. Mr. Iovino notified Regions' Central Region CEO, Rick Ulmer, of Ms. Leeman's plans and asked that she be allowed to remain until the end of the year to retire. Mr. Iovino said that he and two other men would create a transition plan for Ms. Leeman's clients, and that his first choice was to "have a younger producer partner with

Brett" Cain in a mentor/mentee relationship. He added, "Pam [Leeman] has assisted us in promoting the Regions name in Cass [County] and is instrumental in some of the more political business she and Brett write together." Mr. Iovino angered Mr. Ulmer by cancelling a meeting with Mr. Ulmer the following week, leading Mr. Ulmer to question Mr. Iovino's dedication to the firm's growth.

Mr. Iovino also spoke with three other non-validated producers. The fourth male low producer, Tim Hicks, resigned in June 2014. Richard Lemming chose to retire at year's end; Regions says that's why neither Ms. Leeman nor Mr. Lemming were placed on performance improvement plans. Jim Sisson and John Gigli elected not to retire and were placed on performance improvement plans after meeting with Mr. Iovino in March, and Ms. Leeman learned of Mr. Sisson's treatment in April. They failed to improve. Mr. Gigli was terminated and Mr. Sisson resigned.

On March 12, 2014  Rick Ulmer sent Mr. Iovino an email providing a list of "action steps" he wanted Mr. Iovino to take, including, among other things: "speaking with NV [non-validating] producers", and "target[ing] and recruit[ing] new producers and CSAs: get[ting] Big I dates for all events; [contacting] colleges and call[ing] [his] recruiter".

Mr. Iovino responded in a March 16, 2014 email:

I had discussions with the [Leeman, Lemming, Gigli and Sisson] regarding the validation schedule. Unfortunately, [those] discussions...were the first discussions they've had on the subject. Our communication has been non-existent until last week as to their

individual progress and the ramifications for not consistently validating.  With that said, please see the following:

**Pam [Leeman]**– Pam plans to retire and not validate. I request we take Pam [Leeman] out of the validation schedule and allow her to continue until she retires on 12/31/14. As a producer, there isn't an option to "opt out" of the validation process. Also, if she's not validating, it's not up to her to pick her retirement date. So, this becomes a business decision balanced by the political realities of the situation we need to discuss. From now until the end of the year, Grett Cain, Mark Beairsto and I can create a transition plan for her small book of business. My first choice is to have a younger producer partner with Brett as a mento/mentee relationship. Pam [Leeman] has assisted us promoting the Regions name in Cass county and is instrumental in some of the more political business she and Brett write together. So we can discuss and make a better decision, can you have Pam provide a list of her accounts with effective dates ... and then add some of the political back drop or consideration. How many accounts are we really talking about, what the names, contacts, what other team members know the client, etc. We need these facts in order to make a good decision. Then, we will decide on the retirement date of this non-validating producer.

**Rich Lemming** – Rich plans to retire and not validate. I request we take Rich Lemming out of the validation schedule and allow him to continue until he retires on 12/31/14. From now until the end of the year Mark Beairsto and I can create a transition plan for his small book of business .... I think Rich's retirement date should be handled in the same manner as Pam's. ...

**Jim Sisson** – Jim fully intends on validating....

**John Gigli** – John fully intends on validating....

**Tim Hicks** – Tim fully intends on validating....

Rick, please let me know your thoughts. Also, if you are ok with this, I will need guidance from you and Jeff Batts on Pam [Leeman] and Rich Lemming. I will need to communicate to Pam and Rich how their

earned commissions will be paid at the end of 2014. I assume they will continue to be paid commissions in January of 2015 for business hitting in December of 2014 ... and be taken out of the system starting February 2015? Let's get the book information and strategy in place and settle on a retirement date for both of them and we will have the details ready for when those conversations take place. I look forward to hearing from you.

Ms. Leeman met with Mr. Iovino again in May 2014 to discuss Regions' calculation of her production numbers. She learned that Mr. Iovino had done nothing to investigate the disparity Ms. Leeman had reported two months earlier. Ms. Leeman told Mr. Iovino that she wasn't going to retire, and accused Regions - which had placed the non-validating male Jim Sisson on an improvement plan that wasn't offered to her - was discriminating against her. A week later, Ms. Leeman sent Mr. Iovino a letter explaining her belief that she was the victim of discrimination because: (1) the production numbers Mr. Iovino presented to her didn't seem accurate, and the inaccuracies weren't investigated further after she raised the issue with Mr. Iovino; (2) she hadn't received accounts from departing producers; and (3) Mr. Sisson was offered a performance improvement plan, and she wasn't. Ms. Leeman asked to be placed in the performance improvement plan, and asked Regions to investigate her claims about the inaccuracy of Regions' calculations of her performance.

Regions conducted an internal investigation into Ms. Leeman's allegations. The investigation showed that Ms. Leeman's production numbers were about $100,000 below the $350,000 minimum validation threshold. Regions told Ms.

Leeman that its investigation disclosed a discrepancy in how revenue was being reported between Ms. Leeman and Mr. Cain. Once that correction was made, Ms. Leeman's twelve-month book value was $222,030. Ms. Leeman said that figure couldn't be reconciled with the commissions and commission statements she received each month.

The investigation also concluded that Ms. Leeman's allegations of discrimination with respect to past account allocations was unsubstantiated. Only one agent with a significant book of business, Mike Miles, had departed since 2007, and most of his accounts were transferred to his daughter.

During its investigation, Regions discovered that Ms. Leeman, like Mr. Lemming, hadn't been placed on a performance improvement plan in March 2014 because Regions mistakenly believed at the time that she intended to retire at the end of the year. In August 2014, Regions offered to let Ms. Leeman participate in a performance improvement plan, and she accepted. But in January 2015, Regions issued a written warning to Ms. Leeman advising that she'd failed to improve sufficiently under the performance plan. Regions' Central Region Sales Manager, Mark Beairsto, told her that she could be subject to termination if she did not improve her performance.

In January 2015, Regions also: (1) announced that it was going to reduce the rate of compensation on pre-existing co-managed accounts from 25% to 17.5%; and (2) asked its producers to sign an Amendment to the 2006 Producers

Employment Agreement modifying the terms relating to compensation and benefits to be paid or provided to producers by Regions, effective January 1, 2015. [Doc. No. 26-2]. The Amendment deleted paragraph 1 and the Producer Compensation schedule (Exhibit A) of the 2006 Producer Employment Agreement, and replaced it with a new "Compensation, Benefits and Expenses" provision that set the rates of compensation for all new, renewal, and assigned business beginning January 1, 2015. It also provided that: "All commissions and fees are subject to adjustments for ... commission sharing arrangements when other insurance producers or licensed insurance associates assist the Producer in obtaining new, renewal and/or assigned business. ..." (Amendment ¶ 1(a)(i) and (ii)). Producers were told that continued employment was conditioned on signing the Amendment by March 31, 2015. Regions "reversed" the rate change for pre-existing co-managed accounts and retroactively credited any lost compensation to the producers' accounts, including Ms. Leeman's, in response to complaints from the producers. When Ms. Leeman and male producer Chris Williamson refused to sign the Amendment to the 2006 employment agreement, Regions terminated their employment.

Ms. Leeman's third amended complaint alleges that Regions:

(1)     engaged in a pattern or practice of discriminating against women generally, and her specifically, and that its practices had a disparate

12

impact on older women in violation of Title VII and the ADEA (Counts 3 and 5-7);

(2)      retaliated against her for engaging in protected activity (complaining about discrimination and filing this law suit) (Count 8); and

(3)      paid male employees more than it paid her, in violation of the Equal Pay Act (Count 4). Third Amd. Cmplt [Doc. No. 26].

Regions asserts that Ms. Leeman hasn't presented any evidence to support those claims, and moved for summary judgment on all remaining counts.


III. DISCUSSION

A. *Discrimination Claims under Title VII and the ADEA (Counts 3, 5, 6, and 7)*

Title VII and the ADEA prohibit employers from discharging or otherwise discriminating against an individual on the basis of his or her sex or age. 42 U.S.C. § 2000e-2(a); 29 U.S.C. § 623(a). The same "analytical framework" applies to claims under both statutes. Nagle v. Village of Calumet Park, 554 F.3d 1106, 1114 n.3 (7th Cir. 2009). To prevail on her claims, Ms. Leeman must point to evidence sufficient to "permit a reasonable factfinder to conclude that [her sex or age] caused the discharge or other adverse employment action." Ortiz v. Werner Enterprises, Inc., 834 F.3d 760, 765 (7th Cir. 2016). In determining whether she's met that burden, the court will address Ms. Leeman's assertion that she's established a prima facie case of discrimination under the *McDonnell Douglas*

burden-shifting framework, and will consider all the evidence cumulatively under the *Ortiz* "totality-of-the-evidence approach." <u>Gonzalez v. Tape Case Ltd.</u>, No. 17C2011, 2018 WL 3574754, at *2 (N.D. Ill. July 25, 2018); *see also* <u>David v. Bd. of Trustees of Community College Dist. No. 508</u>, 846 F.3d 216, 224 (7th Cir. 2017). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 507 (1993) (quoting <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)).

To establish a *prima facie* case of discrimination, Ms. Leeman must show that: (1) she is a member of a protected class, (2) her job performance met Regions' legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated employee who were not in the protected classes was treated better. <u>Khowaja v. Sessions</u>, 893 F.3d 1010, 1014-15 (7th Cir. 2018). If she establishes a prima facie case, the burden of production shifts to Regions to provide a legitimate, non-discriminatory reason for the adverse employment action. "Once the defendant articulates a lawful reason for the discharge, the presumption of discrimination dissolves, and the burden of production shifts back to the plaintiff to show the employer's reasons are pretextual." <u>King v. General Elec. Co.</u>, 960 F.2d 617, (7th Cir. 1992).

It's undisputed that Ms. Leeman is a member of a protected class based on her age and gender, and that she suffered at least one adverse action — the

termination of her employment in April 2015.[2] Whether she was meeting Regions' legitimate expectations when she was terminated is subject to dispute, and can't be resolved on summary judgment. But Ms. Leeman hasn't presented any evidence from which a reasonable jury could find that a similarly situated employee outside her protected classes was treated more favorably, and hasn't made a prima facie showing of discrimination. The undisputed evidence shows that Regions terminated a younger male, Christopher Williamson, for refusing to sign the amended employment agreement, at the same time it terminated Ms. Leeman.

Even if Ms. Leeman had established a prima facie case, she hasn't presented any evidence that Regions' stated reason for terminating her — refusing to sign the amended agreement — was pretextual. To show pretext, Ms. Leeman "must present evidence suggesting that the employer is dissembling," O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir. 2011) – that its stated reason for terminating her were "phony" or a "lie." Russell v. Acme-Evans Co., 51 F.3d 64,

---

[2] "Not everything that makes an employee unhappy is an actionable adverse action,"Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996), e.g., performance improvement evaluations, voluntary enrichment programs, and delays in receiving credit for new business. *See, e.g.,* Langenbach v. Wal-Mart Stores, Inc., 761 F.3d 792, 799 (7th Cir. 2014); Cole v. Illinois, 562 F.3d 812, 816 (7th Cir. 2009). An adverse employment action is "more disruptive than a mere inconvenience or an alteration of job responsibilities." Crady v. Liberty National Bank and Trust Co. of Indiana, 933 F.2d 132, 136 (7th Cir. 1993). "Isolated comments are not probative of discrimination unless they are 'contemporaneous with the discharge or casually related to the discharge decision-making process,'" Fleishman v. Cont'l Cas. Co., 698 F.3d at 605 (quoting Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1140 (7th Cir. 1997)).

15

68 (7th Cir. 1995). She hasn't done that, and mere speculation on conjecture on her part as to what Regions' motivation was is insufficient.

Ms. Leeman contends that there is other evidence of discrimination. She contends that Regions engaged in a "pattern or practice" of discrimination against older women generally (and her in particular) between 2012 and 2015, when it excluded her from golf outings, gave the accounts of departing agents to other male agents, selected a male agent over her to participate in the Verticals Program, and offered a Performance Improvement Plan to male agents, but not her.

"Pattern-or-practice claims require a 'showing that an employer regularly and purposefully discriminates against a protected group." Puffer v. Allstate Ins. Co., 675 F.3d 709, 716 (7th Cir. 2012) (quoting Council 31, Am. Fed'n of State, Cnty.& Mun. Emps., AFL-CIO v. Ward, 978 F.2d 373, 378 (7th Cir. 1992)). To prove that Regions engaged in a pattern or practice of discrimination, Ms. Leeman "would have to prove 'by a preponderance of the evidence that [the] discrimination was the company's standard operating procedure — the regular rather than the unusual practice.'" EEOC v. Sears, Roebuck & Co., 839 F.2d 302, 354-355 (7th Cir. 1988) (quoting Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 336 (1977)). A reasonable inference might be made that an employer discriminated against a particular individual, "[o]nce plaintiff[] establish[es] a broad pattern or policy of discrimination," King v. General Elec. Co., 960 F.2d 617, 623 (7th Cir.

1992), but "not everything that makes an employee unhappy is an actionable adverse action," Lewis v. Wilkie, 909 F.3d 858, 870 (7th Cir. 2018) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)), and "[i]solated, sporadic discrimination is not sufficient" to prove a pattern or practice of discrimination." King v. General Elec. Co., 960 F.2d at 625. Ms. Leeman has shown nothing more. "To prove that it was more probable than not that an employer that routinely discriminates, discriminated against a particular individual, there must be significant evidence of the alleged routine, *e.g.*, statistical evidence showing the disparities and individual testimony recounting specific instances of discrimination." *Id.* at 624; *see also,* Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 337 (1977) (statistical evidence supported by individual testimony recounting over 40 specific instances of discrimination sufficient to carry burden of proof); Chisholm v. United States Postal Service, 665 F.2d 482, 495 (4th Cir. 1981) (statistical evidence was supported by testimony of 20 class members about individual discrimination); Ste. Marie v. Eastern R. Ass'n, 650 F.2d 395, 406 (2d Cir. 1981) (seven individual discriminatory acts coupled with problematic statistical evidence insufficient to support finding a pattern or practice of discrimination); EEOC v. Federal Reserve Bank of Richmond, 698 F.2d 633, 643-644 (4th Cir. 1983) (20 or 40 class members testifying of class discrimination sufficient; three to seven incidents of discrimination over a period of years insufficient). Ms. Leeman hasn't presented any statistical evidence or

corroborating testimony from other employees recounting incidents of discrimination, and the few incidents she reports were isolated and sporadic, and so insufficient to show a pattern or practice of discrimination. *See* King v. General Elec. Co., 960 F.2d at 624-25.

Ms. Leeman's disparate impact claims (Counts 5-7) fare no better. Disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Int'l Brotherhood of Teamsters v. United States, 431 U.S. at 335 n.15. To prevail on this claim, Ms. Leeman must "isolat[e] and identify[] the specific employment practices that are allegedly responsible for any observed statistical disparities." Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988); Puffer v. Allstate Ins. Co., 675 F.3d at 717. She hasn't identified any facially neutral policy or practice that "falls more harshly" on older women producers, or presented any statistical evidence to support such a claim.

The only evidence submitted in support of Ms. Leeman's age discrimination claim was Mr. Iovino's alleged retirement comment during their March 11, 2014 meeting. Accepting Ms. Leeman's account of the meeting as true, a single mention of retirement as alternative to termination isn't proof of age discrimination. *See* Fleishman v. Conntinental Casualty Co., 698 F.3d 598, 604 (7th Cir. 2012). "[I]solated comments are not probative of discrimination unless they are

'contemporaneous with the discharge or causally related to the discharge decision-making process.'" <u>Fleishman v. Conntinental Casualty Co.</u>, 698 F.3d 598, 605 (7th Cir. 2012) (*quoting* <u>Gleason v. Mesirow Fin., Inc.</u>, 118 F.3d 1134, 1140 (7th Cir. 1997)). "[A] lapse in time obviates any connection between the comment and discharge when there is an intervening, legal reason for the termination — the [refusal to sign the amendment to the 2006 Producer Employment Agreement]." <u>Fleishman v. Conntinental Casualty Co.</u>, 698 F.3d at 605. Ms. Leeman has offered nothing more.

Ms. Leeman contends that she was subject to an adverse employment action in 2012, when Mike Miles reallocated his accounts to his daughter and another male producer, but that claim is time-barred. Discrimination claims under Title VII and the ADEA must be filed within 180 days after the alleged unlawful employment practice occurred or within 300 days if the claimant initially instituted the proceedings with a State or local agency with authority to grant relief. 42 U.S.C. § 2000e-5(e).

Ms. Leeman filed her first charge of discrimination alleging violations of Title VII and the ADEA on June 25, 2014, so a claim for any violations that occurred on or before August 29, 2013 would be too late. The only post-August 29, 2013 reassignment that Ms. Leeman mentions is a reassignment of an account to her in February 2015, when several of Jim Sisson's accounts were reassigned to Ms.

Leeman. But Ms. Leeman complains of being kept out of reassignments, not getting them.

The 300-day limitations period wasn't triggered until Ms. Leeman knew or should have known of the discriminatory reassignment of the accounts. See Webb v. Indiana Nat'l Bank, 931 F.2d 434, 436 (7th Cir. 1991). Ms. Leeman first believed that all of Mr. Miles's accounts had been transferred to his daughter. Ms. Leeman's affidavit says – without contradiction from Regions – she first learned of the school accounts going to Mr. Thatcher in May 2013 [Doc. No. 76-1, at 7] and of the Dilling account going to Mr. Cain in July or August 2013 [Doc. No. 76-1, at 4]. At least one of Ms. Leeman's discrimination charges may have been was filed within 300 days of those discoveries.

Even if all of her claims were timely, the reassignments of those accounts don't support an inference of sex discrimination or age discrimination. Most of Mr. Miles's accounts went to his daughter, a female; that some went to men carries no inference of sex discrimination. Mr. Thatcher and Mr. Cain, the recipients of some of those accounts, were both well over the age of forty in 2013: Mr. Thatcher was about 56 years old and Mr. Cain was about 52, while Ms. Leeman was about 64. Given the modest age differentials, benefitting Mr. Thatcher and Mr. Cain rather than Ms. Leeman carries no inference of age discrimination.

## B. *Retaliation Claim (Count 8)*

"Unlawful retaliation occurs when an employer takes an adverse employment acgtin against an employee for opposing impermissible discrimination." <u>Tank v. T-Mobile USA, Inc.</u>, 758 F.3d 800, 807 (7th Cir. 2014). Ms. Leeman can prevail on a retaliation claim under Title VII or the ADEA, if she can show that: "(1) [she] engaged in statutorily protected activity; (2) [she] suffered an adverse employment action; and (3) a causal link exists between the two." <u>Majors v. General Elec. Co.</u>, 714 F.3d 527, 537 (7th Cir. 2013); <u>Smith v. Lafayette Bank & Trust Co.</u>, 674 F.3d 655, 657 (7th Cir. 2012). Ms. Leeman can also use the *McDonnell Douglas* framework to show that: "(1) the employee engaged in statutorily protected activity; (2) [she] was meeting [her] employer's legitimate expectations; (3) [she] suffered an adverse employment action; and (4) [she] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." <u>Majors v. General Elec. Co.</u>, 714 F.3d at 537. "Under the indirect method of proof, failure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim." <u>Hudson v. Chicago Transit Auth.</u>, 375 F.3d 552, 560 (7th Cir.2004). If Ms. Leeman establishes a prima facie case, she must still show that Regions' legitimate, non-discriminatory reason for terminating her was pretextual. *See* <u>Hilt–Dyson v. City of Chicago</u>, 282 F.3d 456, 465 (7th Cir. 2002).

"To show that an employer's proffered reason is pretextual, a plaintiff must do more than demonstrate that the employer made a mistake or that the employer's reason was not good enough to support its decision." Balderston v. Fairbanks Morse Engine Div. of Coltec Indus., 328 F.3d 309, 323 (7th Cir. 2003), *as amended* (May 22, 2003). Instead, plaintiffs must "provide 'evidence tending to prove that the employer's reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge.'" *Id.* (quoting Testerman v. EDS Technical Prods. Corp., 98 F.3d 297, 303 (7th Cir. 1996). The ultimate question remains the same under either method: "whether a reasonable juror could conclude that [Ms. Leeman] would have kept [her] job if [s]he [hadn't engaged in the protected activities]." Ortiz v. Werner Enterprises, 834 F.3d 760, 764 (7th Cir. 2016).

The parties don't dispute that Ms. Leeman was engaged in statutorily protected activity, and that she suffered an adverse employment action, but there is no evidence from which a jury could reasonably find any connection between her complaints of discrimination and her termination or any of the other actionable adverse action, that she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity, or that Regions' stated reason for terminating her employment was discriminatory. The only similarly situated employee offered as a comparator was Mr. Williamson, and the evidence shows that he was terminated for the same reason. "Title VII's anti-

retaliation provision does not protect an employee against 'petty slights or minor annoyances that often take place at work and that all employees experience.'" Lewis v. Wilkie, 909 F.3d at 867 (quoting Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)); *see also* Poullard v. McDonald., 829 F.3d 844, 857 (7th Cir. 2016). Ms. Leeman can point to nothing more.

## C. *Equal Pay Act Claim (Count 4)*

To establish a prima facie case of discrimination under the Equal Pay Act, Ms. Leeman must show that: "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." Cullen v. Indiana Univ. Bd. of Trustees, 338 F.3d 693, 698 (7th Cir. 2003). If she meets that burden, the burden shifts to Regions to show that the pay disparity was justified in one of four ways: 1) a seniority system; 2) a merit system; 3) a system which measures earnings by quantity or quality of production; or 4) any factor other than sex. *See* 29 U.S.C. § 206(d)(1); 29 C.F.R. § 1620.20; Boumehdi v. Plastag Holdings, LLC, 489 F.3d 781, 793–794 (7th Cir.2007); Fallon v. Illinois, 882 F.2d 1206, 1211 (7th Cir.1989); Schultz v. Dep't of Workforce Dev., 752 F. Supp. 2d 1015, 1023–1024 (W.D. Wis. 2010).

The undisputed evidence in this case shows that Ms. Leeman was paid the same amount for accounts she serviced on her own, and was paid as much as, or

more than, her male counterparts for shared accounts. The usual commission for shared accounts was half of the standard 35% commission, but Ms. Leeman was able to successfully negotiate a shared commission of 50% on her shared accounts, split equally with Mr. McCain. Based on the evidence presented, no reasonable juror could find that Regions violated the Equal Pay Act.

IV. CONCLUSION

For the foregoing reasons, the court GRANTS the defendant's motion for summary judgment on Counts 3-8 [Doc. No. 58]. The Clerk is directed to enter judgment accordingly.

SO ORDERED.

ENTERED: __March 28, 2019__

___/s/ Robert L. Miller, Jr.___
Judge
United States District Court